v.

**STATE of Indiana, Appellee–Plaintiff.**

No. 49A02–0903–JV–218.

Court of Appeals of Indiana.

Nov. 10, 2009.

Transfer Denied Jan. 21, 2010.

Anna Onaitis Holden, Marion County Public Defender Agency, Indianapolis, IN, Attorney for Appellant.

Gregory F. Zoeller, Attorney General of Indiana, Michael Gene Worden, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

**OPINION**

DARDEN, Judge.

### STATEMENT OF THE CASE

R.H. appeals his adjudication as a delinquent child for committing what would constitute class A misdemeanor possession of marijuana if committed by an adult.

We affirm.[1]

### ISSUES

1. Whether the trial court abused its discretion in admitting evidence.

2. Whether there is sufficient evidence to support the delinquency finding.

### FACTS

At approximately 11:40 p.m. on November 22, 2008, Indianapolis Metropolitan Police Officer Shawn Holmes was patrolling in a fully marked police car, when he responded to a dispatch reporting a suspicious white vehicle with four males inside of it parked in front of the caller's residence in the 1400 block of Milburn Street. The caller informed dispatch that she did not recognize the vehicle and "was fearful that there was something going on." (Tr. 13).

Officer Holmes parked at the corner of 14th Street and Milburn Street and observed "a white four door vehicle with what appeared to be occupants inside" parked on the street. (Tr. 11). He, however, could not see what the occupants were doing. He activated his emergency lights because "it was dark that night and [he] wanted to be visible to" other vehicles. (Tr. 12).

Officer Holmes approached the vehicle, observed heavy smoke inside the vehicle, and knocked on the rear right passenger window. "[A] large amount of smoke came billowing out" as the window rolled down. (Tr. 17). Officer Holmes immediately recognized the smell of burnt marijuana. Four males were in the vehicle,

---

1. We heard oral argument in this case on September 30, 2009, at Hamilton Southeastern High School. We wish to commend counsel on the quality of their advocacy and extend our thanks to the students, staff, faculty, and administration of Hamilton Southeastern High School for their hospitality.

including R.H., who was in the driver's seat.[2] Officer Holmes had the occupants exit the vehicle and read them their *Miranda* warnings. He asked the two adult occupants whether there was any more marijuana in the vehicle; they replied that "[t]hey had smoked it all." (Tr. 18).

Officer Holmes, however, observed "what was left of a burnt marijuana cigarette" in the front console's ashtray. (Tr. 18). He also observed two bags containing what appeared to be marijuana in the front passenger footwall, "just setting [sic] out." (Tr. 42). The bags "would have been at the passenger's feet." (Tr. 42). Subsequent tests revealed that one bag contained 23.37 grams of marijuana; the other bag contained 9.37 grams of marijuana. The cigarette contained .07 grams of marijuana.

On December 10, 2008, the State filed a petition, alleging R.H. to be a delinquent child for committing an act that would constitute class A misdemeanor possession of marijuana, if committed by an adult. The trial court approved the filing of the petition on December 17, 2008. The trial court held a denial hearing on February 4, 2009, after which it found the allegations against R.H. to be true. The trial court placed R.H. on probation for six months and ordered him to complete thirty hours of community service.

## DECISION

### 1. Admission of Evidence

R.H. asserts the trial court abused its discretion in admitting evidence that he possessed marijuana. The admission of evidence is a matter left to the sound discretion of the trial court, and a reviewing court will reverse only upon an abuse of that discretion. *Washington v. State,* 784 N.E.2d 584, 587 (Ind.Ct.App.2003).

An abuse of discretion occurs when a decision is clearly against the logic and effect of the facts and circumstances before the trial court. *Id.* "We do not reweigh the evidence, and we consider conflicting evidence most favorable to the trial court's ruling." *Lundquist v. State,* 834 N.E.2d 1061, 1067 (Ind.Ct.App.2005). "However, we must also consider the uncontested evidence favorable to the defendant." *Id.*

R.H. argues that the seizure of the marijuana resulted from a detention that violated the Fourth Amendment to the United States Constitution and Article 1, Section 11 of the Indiana Constitution. Namely, he contends that Officer Holmes lacked reasonable suspicion to conduct an investigatory stop.

Both the Fourth Amendment to the United States Constitution and Article 1, Section 11 of the Indiana Constitution protect the privacy and possessory interests of individuals by prohibiting unreasonable searches and seizures. *Barfield v. State,* 776 N.E.2d 404, 406. (Ind.Ct.App. 2002). This protection also governs " 'seizures' of the person." *Terry v. Ohio,* 392 U.S. 1, 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

Generally, a seizure does not occur until the defendant is actually detained. *California v. Hodari D.,* 499 U.S. 621, 624–26, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991); *Wilson v. State,* 670 N.E.2d 27, 31 (Ind.Ct.App.1996) (holding there is no violation of the Fourth Amendment until a physical seizure of the person is accomplished). "Detention turns on an evaluation, under all the circumstances, of whether a reasonable person would feel free to disregard the police and go about his or her business." *Finger v. State,* 799

---

2. The vehicle was registered to R.H.'s father.

N.E.2d 528, 532 (Ind.2003) (citing *Hodari D.*, 499 U.S. at 628, 111 S.Ct. 1547).

Not all police-citizen encounters implicate the Fourth Amendment. *Huey v. State,* 503 N.E.2d 623, 625 (Ind.Ct.App. 1987). A seizure, for example, does not occur "simply because a police officer approaches a person, asks questions, or requests identification." *Bentley v. State,* 846 N.E.2d 300, 305 (Ind.Ct.App.2006), *trans. denied.* "Instead, a person is seized for Fourth Amendment purposes, when, considering all the surrounding circumstances, the police conduct 'would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter.'" *Id.* (quoting *Florida v. Royer,* 460 U.S. 491, 497, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983)).

Here, R.H. argues that Officer Holmes initiated an investigatory stop when he parked behind R.H.'s vehicle and activated his emergency lights. Specifically, he contends that "[a]ctivation of a cruiser's emergency lights is a significant show of authority that would convey to any reasonable person he is not free to leave an officer's presence." R.H.'s Br. at 6–7.

The facts of this case are similar to that in *Finger.* In that case, an officer with the Butler University Police Department received a dispatch after a "concerned citizen" reported a suspicious vehicle parked at an intersection. 799 N.E.2d at 530. The officer found the vehicle parked near the intersection and "partially in a driving lane...." *Id.* He observed two people inside the vehicle. The officer parked his police vehicle behind the vehicle and activated his emergency lights before approaching the vehicle. The officer asked the occupants "'what was happening'" and whether they needed assistance. *Id.* Finger, who was sitting in the driver's seat, responded that the car was out of gasoline and that they were waiting for someone to bring them some. Observing that the fuel gauge was not at empty and that Finger seemed nervous, the officer requested his driver's license. The officer had not returned the license when he observed a knife in the back seat and ammunition in the front seat. Upon hearing a report of an armed robbery in the area, the officer asked Finger and his passenger to exit the vehicle. He later placed them under arrest after a witness to the robbery identified the passenger as having committed the robbery.

Finger later argued that the officer's initial encounter was unjustified as an investigative stop under the Fourth Amendment to the United States Constitution and Article 1, Section 11 of the Indiana Constitution. Other than obtaining and retaining Finger's driver's license, the Indiana Supreme Court found that the officer's "actions, taken together, would not lead a reasonable person to feel that he was not free to leave." *Id.* at 533. Namely, it determined that parking behind a vehicle, activating emergency lights, and asking questions of the occupants were "all things a police officer would be expected to do upon finding a stranded motorist and do not indicate to a reasonable motorist that the officer intends to detain him." *Id.*

As occurred in *Finger,* Officer Holmes received a dispatch late at night from a concerned citizen regarding a report of a suspicious vehicle parked on the street; apparently, the car was parked in front of the nervous 911–caller's residence.[3] When

---

**3.** R.H. argues that *Finger* is distinguishable from his case because Finger's car was "'partially in a driving lane,' and [Finger] initially claimed to be out of gas." R.H.'s Br. at 12. We cannot agree. The officer in Finger had no indication that Finger was a stranded mo-

he arrived at the scene, he found a vehicle matching the description given already stopped and parked. He then proceeded to park his police vehicle and activate his emergency lights in order to alert others of his presence. He then approached R.H.'s vehicle to ask the occupants some questions or request their identification. As in *Finger*, these are all procedures that an officer would be expected to do upon finding an occupied vehicle parked on the street late at night, and "do not indicate to a reasonable motorist that the officer intends to detain him." *Id.; see also Simmons v. State*, 781 N.E.2d 1151, 1155 (Ind. Ct.App.2002) (finding the use of emergency lights to be "no more coercive than" calling out to a person and asking to speak with them where the lights were activated simply to announce the officer's presence and to get the defendant's attention).

In fact, given that the Officer Holmes was investigating a concerned citizen's call at a very late hour, we would think he, or any other officer, would be remiss in not activating his or her emergency lights. To fail to do so would put other drivers at risk. In addition, it clearly would put the officer at risk to approach a vehicle late at night without first alerting the unknown occupants that he or she is a safety enforcement officer.

R.H. also cites to *Bentley v. State*, 779 N.E.2d 70 (Ind.Ct.App.2002) in arguing that the use of emergency lights would be interpreted by a reasonable person as an intrusion upon freedom of movement. While the "use of siren or flashers" could be interpreted as such an intrusion, the circumstances of this case do not suggest

that Officer Holmes seized R.H. when he activated his lights. *See* 779 N.E.2d at 74. In *Bentley*, not only did the officers activate their emergency lights,[4] but they also parked their police vehicle in a manner that blocked traffic. Two officers then approached Bentley. Thus, "the circumstances of the stop, including the activated lights, position of the vehicle, and number of officers present," led to the conclusion that "any reasonable person or passer-by on the street would conclude that Bentley was not free to leave the scene." *Id.* 779 N.E.2d at 76. While Officer Holmes did activate his lights, he in no way hindered traffic or R.H.'s vehicle; furthermore, there is no evidence that any other officer approached R.H.'s vehicle.

R.H. also cites to the Indiana Code to support his argument that "activation of emergency lights constitutes an intrusion on one's freedom of movement." R.H.'s Br. at 12–13. Specifically, Indiana Code section 9–21–8–35 provides, in relevant part, as follows:

(a) Upon the immediate approach of an authorized emergency vehicle, when the person who drives the authorized emergency vehicle is giving audible signal by siren or displaying alternately flashing red, red and white, or red and blue lights, a person who drives another vehicle shall do the following unless otherwise directed by a law enforcement officer:

. . . .

(3) Stop and remain in the position until the authorized emergency vehicle has passed.

---

torist when he stopped his police vehicle. Rather, like Officer Holmes, he was responding to a concerned citizen's report of a suspicious vehicle. Furthermore, there is no indication that the officer activated his emergency lights because Finger was parked partially in a driving lane.

4. The *Bentley* opinion does not indicate at what time the stop occurred. It is therefore unclear whether the officers activated their lights for a reason other than to show their authority.

The record is clear, however, that R.H. was not driving but that his vehicle already was parked when Officer Holmes arrived at the scene. Thus, the statute does not apply.

Moreover, this statute also provides as follows:

(b) Upon approaching a stationary authorized emergency vehicle, when the authorized emergency vehicle is giving a signal by displaying alternately flashing red, red and white, or red and blue lights, a person who drives an approaching vehicle shall:

(1) proceeding with due caution, yield the right-of-way by making a lane change into a lane not adjacent to that of the authorized emergency vehicle, if possible with due regard to safety and traffic conditions, if on a highway having at least four (4) lanes with not less than two (2) lanes proceeding in the same direction as the approaching vehicle; or

(2) proceeding with due caution, reduce the speed of the vehicle, maintaining a safe speed for road conditions, if changing lanes would be impossible or unsafe.

Therefore, Officer Holmes' activation of his emergency lights could indicate to a reasonable motorist that he merely intended to warn approaching vehicles of his presence and to proceed with caution.

Citing to Indiana Code section 35–44–3–3, R.H. maintains that the "approach by a police vehicle with activated emergency lights sends a strong signal to any reasonable person his freedom of movement has been restricted." R.H.'s Br. at 13. Indiana Code section 35–44–3–3(a)(3) provides that a person commits class A misdemeanor resisting law enforcement when he knowingly or intentionally

flees from a law enforcement officer after the officer has, by visible or audible means, including operation of the law enforcement officer's siren or emergen-

cy lights, identified himself or herself and ordered the person to stop[.]

While Officer Holmes may have activated his emergency lights in order to identify himself to other motorists, we are not persuaded that it constituted an order to stop.

Given the objective and articulable facts of this case, we do not find that Officer Holmes' approach and initial contact with R.H. amounted to a seizure under the Fourth Amendment where he was responding to a report from concerned citizen regarding a strange vehicle parked in front of the citizen's residence; it was late at night; the vehicle already was stopped; and Officer Holmes displayed no force. *See Huey*, 503 N.E.2d at 625 (finding no "seizure which required specific, articulable facts indicating a crime had been committed or was about to be committed" where the defendant was in his own car, the officer did not stop the defendant and the officer's initial question did not accuse the defendant of a crime); *see also Overstreet v. State*, 724 N.E.2d 661, 664 (Ind.Ct. App.2000) (discussing examples of circumstances under which a reasonable person would have believed he was not free to leave, including "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled"), *trans. denied.*

Because the initial encounter did not constitute an investigatory stop, we need not address whether Officer Holmes had the requisite reasonable suspicion required under *Terry* to conduct an investigatory stop. Accordingly, we find no abuse of discretion in admitting evidence of the marijuana.

### 2. *Sufficiency of the Evidence*

R.H. also asserts that the evidence is insufficient to support his adjudication

as a delinquent child. Specifically, he argues that the State failed to prove that he knew of or had the ability to control the bags of marijuana and the marijuana cigarette.

When reviewing the sufficiency of the evidence to support a conviction, appellate courts must consider only the probative evidence and reasonable inferences *supporting* the verdict. It is the fact-finder's role, not that of appellate courts, to assess witness credibility and weigh the evidence to determine whether it is sufficient to support a conviction. To preserve this structure, when appellate courts are confronted with conflicting evidence, they must consider it most favorably to the trial court's ruling. Appellate courts affirm the conviction unless no reasonable fact-finder *could* find the elements of the crime proven beyond a reasonable doubt. It is therefore not necessary that the evidence overcome every reasonable hypothesis of innocence. The evidence is sufficient if an inference may reasonably be drawn from it to support the verdict.

*Drane v. State,* 867 N.E.2d 144, 146–47 (Ind.2007) (quotations and citations omitted).

To adjudicate R.H. a delinquent child for having committed what would constitute class A misdemeanor possession of marijuana if committed by an adult, the State was required to prove that he knowingly or intentionally possessed thirty grams or less of marijuana. *See* I.C. § 35–48–4–11.

This court has long recognized that a conviction for possession of contraband may be founded upon actual or constructive possession. Constructive possession is established by showing that the defendant has the intent and capability to maintain dominion and control over the contraband.

In cases where the accused has exclusive possession of the premises on which the contraband is found, an inference is permitted that he or she knew of the presence of contraband and was capable of controlling it. However, when possession of the premises is non-exclusive, the inference is not permitted absent some additional circumstances indicating knowledge of the presence of the contraband and the ability to control it.

Among the recognized "additional circumstances" are: (1) incriminating statements by the defendant; (2) attempted flight or furtive gestures; (3) a drug manufacturing setting; (4) proximity of the defendant to the contraband; (5) contraband is in plain view; and (6) location of the contraband is in close proximity to items owned by the defendant.

*Holmes v. State,* 785 N.E.2d 658, 660–61 (Ind.Ct.App.2003) (citations omitted).

It is undisputed that R.H. did not exercise exclusive control of the vehicle. Thus, the State was required to present evidence of additional circumstances indicating his knowledge of the presence of the marijuana and his ability to control it.

The evidence shows that when Officer Holmes came upon the vehicle, it was filled with smoke that smelled like burnt marijuana, and R.H. was sitting in the driver's seat. Shortly thereafter, he observed a burnt marijuana cigarette. The cigarette was in the vehicle's ashtray, between the driver and passenger's seats. It was in plain view and well within the reach of R.H. Thus, the fact-finder could reasonably infer that R.H. knew of the marijuana cigarette's presence and had the ability to exercise dominion and control over it.

The evidence also shows that Officer Holmes discovered two bags of marijuana in the front passenger's footwell. He

testified that the bags were "just setting [sic] out." (Tr. 42). Again, the fact-finder could reasonably infer that R.H. was aware of the bagged marijuana's presence and that he had the ability to control it given his close proximity to the bags and the size of the vehicle. The State therefore presented sufficient evidence to support R.H.'s adjudication as a juvenile delinquent for committing what would constitute class A misdemeanor possession of marijuana if committed by an adult.

Affirmed.

ROBB, J., concurs.

MATHIAS, J., concurring with separate opinion.

MATHIAS, Judge, concurring.

I concur.

Each contested incident like the one before us is extremely fact-sensitive. Several facts stand out in this case that, when considered together, are dispositive of R.H.'s contentions. The incident occurred at 11:40 p.m., and not during daylight hours. The officer's conduct was in response to an identifiable, concerned citizen's 911 call, one whose claim could be assessed for veracity and substance before the officer responded. R.H.'s vehicle was parked in front of the concerned citizen's residence where she could see movement in the parked vehicle, during later evening hours in the dark.

We as a society desire our law enforcement organizations to respond in situations like the one before us in exactly the way the officer conducted himself. A healthy, civil society is most robust when it feels safe and when that feeling of safety is validated through interaction with vigilant and responsive law enforcement engaged in the important business of policing neighborhoods within a community. Simply said, we all want to be able to depend upon law enforcement to check on the occupants of vehicles in circumstances like those before us.

But this type of policing activity stretches the current rubric of legal review under the Fourth Amendment of the U.S. Constitution and Article 1, Section 11 of the Constitution of Indiana. Our caselaw consistently holds the Fourth Amendment "does not deal with situations in which a person voluntarily interacts with a police officer" and whether there was a detention "turns on an evaluation, under all the circumstances, of whether a reasonable person would feel free to disregard the police and go about his or her business." *See Finger v. State,* 799 N.E.2d 528, 532 (Ind. 2003). However, no right-minded person ever feels empowered to "disregard the police"—whether it is a matter of driving away or simply refusing to answer questions—unless specifically told he or she is free to do so. *See Overstreet v. State,* 724 N.E.2d 661, 665 (Ind.Ct.App.2000), *trans. denied* (Robb, J., dissenting) ("Despite our many statements to the contrary, I do not think that any reasonable person, when approached by a police officer and questioned about his activities, would honestly feel free to refuse to answer or to leave."). In the case before us, no right-minded person would have felt empowered to start the engine of his or her vehicle and leave the scene once the officer's emergency lights were switched on. In fact, a solid statutory argument can be made that it would have been illegal for R.H. to drive away once Officer Holmes approached the vehicle with his emergency lights activated. *See* Ind.Code § 35–44–3–3(a)(3). The test should not be whether a reasonable person feels free to leave, because every stop is a seizure to the extent no reasonable person ever does feel free to leave; the test should be whether the seizure has

become an unreasonable intrusion. Therefore, for Fourth Amendment purposes, I think it is better to consider a vehicle in these circumstances to be stopped within the meaning of *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968),[5] with subsequent officer and occupant behavior assessed accordingly, and the facts giving rise to R.H.'s stop are facts we have previously held warrant at least a *Terry* stop. *See Finger,* 799 N.E.2d at 534 (concerned citizen reported suspicious parked vehicle late at night); *State v. Hawkins,* 766 N.E.2d 749, 752 (Ind.Ct.App.2002), *trans. denied* (smell of burnt marijuana constitutes probable cause to search).

Under Article 1 Section 11, we need only look to the *Litchfield* elements to find the officer's conduct reasonable under the circumstances.[6] Since the car was parked on a public street, there was essentially no intrusion into R.H.'s privacy, and the identifiable 911 caller, the vehicle's location parked in front of her residence and time of night all combined to make the officer's conduct quite reasonable. Change even one of these facts, however, and very different considerations could lead to a very different result.

As it stands, our supreme court's opinion in *Finger v. State,* is directly on point and dispositive of R.H.'s arguments under the law as it is currently developed. I therefore fully concur in Judge Darden's opinion.

---

5. In *Terry,* the United States Supreme Court held that an officer may conduct a brief, investigatory stop when, based on a totality of the circumstances, the officer has a reasonable, articulable suspicion that criminal activity is afoot. 392 U.S. at 30, 88 S.Ct. 1868.

   Reasonable suspicion entails some minimal level of objective justification for making a stop, something more than an unparticularized suspicion or hunch, but less than the level of suspicion required for probable cause. Even if the stop is justified, a reasonable suspicion only allows the officer to temporarily freeze the situation for inquiry and does not give him all the rights attendant to an arrest. To evaluate the validity of a stop, the totality of the circumstances must be considered.
   *State v. Campbell,* 905 N.E.2d 51, 54 (Ind.Ct. App.2009), *trans. denied* (citations omitted).

6. The *Litchfield* court determined that the reasonableness of a search or seizure turns on a balance of: 1) the degree of concern, suspicion, or knowledge that a violation has occurred; 2) the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities; and 3) the extent of law enforcement needs. 824 N.E.2d 356, 361 (Ind.2005).