

FILED

Jul 25 2019, 9:08 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Emily Grothoff
Lawrence County Public Defender
Agency
Bedford, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Matthew B. MacKenzie
Deputy Attorney General
Indianapolis, Indiana

IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Kristapher D. Canfield,<br>*Appellant-Defendant*,<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff*. | July 25, 2019<br><br>Court of Appeals Case No.<br>18A-CR-3124<br><br>Appeal from the Lawrence<br>Superior Court<br><br>The Honorable William G. Sleva,<br>Judge<br><br>Trial Court Cause No.<br>47D02-1805-F4-703 |

**Brown, Judge.**

[1] Kristapher D. Canfield appeals his conviction for possession of methamphetamine as a level 5 felony. He raises four issues which we consolidate and restate as:

I.  Whether the trial court abused its discretion in admitting certain evidence; and

II. Whether the evidence is sufficient to sustain his conviction.

We affirm.

### Facts and Procedural History

[2] On May 9, 2018, Bedford Police Major Jeremy Bridges was advised by dispatch of an anonymous call regarding a male in a Taco Bell uniform outside the restaurant near the dumpster area of the parking lot who appeared to pull something from his waist and that the item might have been an illegal substance. He and Bedford Police Sergeant Blake Wade arrived at the Taco Bell within a couple of minutes, entered it, and identified Canfield based upon the description that was given by dispatch. Major Bridges went to the cash register and asked Canfield if he could speak with him, Canfield said that he needed to tell his manager, and Major Bridges told him that was fine. Canfield walked back to the food preparation area. Major Bridges observed him stand off to the left side of the area and that he "appeared to be digging around his waistband area." Transcript Volume II at 70. He heard something fall at one point which he later determined was a pizza box, and Canfield "kind of squatted down and then came back up shortly after" and "it was like he picked up something or had moved something." *Id.* Canfield then turned and

approached Major Bridges while eating a slice of pizza. Major Bridges asked Canfield if he would step outside so that they would not disrupt the business, he agreed, and they and Sergeant Wade went outside.

[3] Major Bridges then advised Canfield of the complaint, asked him his name, and stated that he was going to go back in to speak to the manager to see if he could obtain consent to search where Canfield was last seen standing. When he told Canfield that he had reason to believe that Canfield possibly had tried to hide an item, he became extremely nervous and "started fidgeting really nervously" and "[h]is speech started speeding up, slowing down, it was just a nervous speech." *Id.* at 71. Major Bridges went back inside the restaurant.

[4] Sergeant Wade observed that Canfield appeared to be "very nervous," fidgety, agitated, "swaying a little bit," and was "trying to eat a piece of pizza in a rapid manner." *Id.* at 41. Canfield's actions made Sergeant Wade "feel like [he] should check his person for weapons since [he] was by [himself] with him." *Id.* at 45. Sergeant Wade stated: "You know, given your state of what you're doing, I'm going to pat you down for officer safety." *Id.* at 41. He pulled away the kitchen apron Canfield was wearing over the outside of his clothing, noticed that the fly of Canfield's pants was undone and pulled open, and asked him why. Canfield said, "I don't have anything on me." *Id.* Sergeant Wade concluded the outer pat-down of his pants pockets and waistband area.

[5] Meanwhile, Major Bridges advised the manager of the complaint and requested permission to go to the back where Canfield was seen digging in his waistband,

and she granted him consent to search the area and walked him back through the food preparation area. He took a quick look around, noticed the pizza box, looked down under a wire rack, and saw a bag containing several smaller bags with white crystal powdery substance inside about six to seven inches under the shelving, which later tested positive for methamphetamine and weighed 4.23 grams. He picked up the bag, walked outside, and advised Canfield what he had found. Canfield began asking if he could speak to somebody and advised that he thought he could "get some big players." *Id.* at 82.

[6] Sergeant Wade transported Canfield to the Bedford Police Department where he was Mirandized. Canfield again requested to speak to a drug detective "advising that the items found had came from the plug or the source, that he can get some big players . . . ."[1] *Id.* at 84. Major Bridges asked Canfield how much he thought he had on him at the time, and he said three grams or so.

[7] On May 10, 2018, the State charged Canfield with possession of methamphetamine as a level 4 felony. It also filed a notice of intent to seek an enhanced penalty based upon a prior conviction.

[8] On July 17, 2018, Canfield filed a motion to suppress and asserted that the police illegally detained him, searched the area he was ordered to exit, and seized evidence from that search. In August 2018, the court held a hearing at

---

[1] When asked what he knew "the plug" to mean, Major Bridges answered: "The source. Where it was manufactured or made." Transcript Volume II at 84.

which Major Bridges, Sergeant Wade, and Canfield testified, and on September 26, 2018, the court denied the motion to suppress. On October 25, 2018, Canfield filed a motion to certify the order for interlocutory appeal, which the court denied. That same day, the State filed a motion for leave to amend the information to modify the charge to a level 5 felony, and the court granted the motion.

[9] On October 30, 2018, a bench trial was held. During Major Bridges's testimony, Canfield's counsel asked the court to disallow any testimony about anything that occurred after Canfield was taken outside, which the court denied. The court admitted evidence that Canfield had a prior conviction for dealing in methamphetamine as a class B felony. It found him guilty of possession of methamphetamine as a level 5 felony and sentenced him to five years incarceration.

## *Discussion*

### I.

[10] The first issue is whether the trial court abused its discretion in admitting evidence discovered inside the restaurant and Canfield's statements at the police station. Although Canfield originally moved to suppress the evidence, he now challenges the admission of the evidence at trial. Thus, the issue is appropriately framed as whether the trial court abused its discretion by admitting the evidence. *See Guilmette v. State*, 14 N.E.3d 38, 40 (Ind. 2014). Because the trial court is best able to weigh the evidence and assess witness

credibility, we review its rulings on admissibility for abuse of discretion and reverse only if a ruling is clearly against the logic and effect of the facts and circumstances and the error affects a party's substantial rights. *Carpenter v. State*, 18 N.E.3d 998, 1001 (Ind. 2014). The ultimate determination of the constitutionality of a search or seizure is a question of law that we consider *de novo*. *Id.* In ruling on admissibility following the denial of a motion to suppress, the trial court considers the foundational evidence presented at trial. *Id.* If the foundational evidence at trial is not the same as that presented at the suppression hearing, the trial court must make its decision based upon trial evidence and may consider hearing evidence only if it does not conflict with trial evidence. *Guilmette*, 14 N.E.3d at 40 n.1.

[11] Canfield raises arguments under: (A) the Fourth Amendment of the United States Constitution; and (B) Article 1, Section 11 of the Indiana Constitution.

A. *Fourth Amendment*

[12] Canfield argues that the seizure, his detention, and the search of the restaurant violated the Fourth Amendment. He asserts that police went to the restaurant solely on the basis of an uncorroborated anonymous tip, that any casual encounter with police quickly evolved into an investigatory stop, that he had an expectation of privacy in his workplace, and that he did not have the ability to object to the search because he was physically separated by the police when consent was given by the manager. He also argues that, even if we accept the facts most favorable to the State, the contraband which Major Bridges found in

the storeroom should have been suppressed under Indiana's doctrine of forced abandonment.

[13] The State argues that Canfield has no standing to contest the search of the restaurant storage room because he had no reasonable expectation of privacy where his methamphetamine was discovered hidden under a wire shelving unit. It asserts that, even if Canfield could challenge the search, his Fourth Amendment rights were not violated because the restaurant manager consented to the search. It contends that Canfield's other arguments regarding the anonymous tip, his detention, and his abandonment of the methamphetamine do not change the analysis because they do not alter his standing to contest the search or the consent given by the manager. It also argues that he was not forced to abandon his property because he was not illegally seized.

[14] The Fourth Amendment to the United States Constitution provides, in pertinent part: "[t]he right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. CONST. amend. IV. If the search is conducted without a warrant, the State bears the burden to show that one of the well-delineated exceptions to the warrant requirement applies. *M.O. v. State*, 63 N.E.3d 329, 331 (Ind. 2016).

[15] One well-recognized exception to the warrant requirement is a voluntary and knowing consent to search. *Bradley v. State*, 54 N.E.3d 996, 999 (Ind. 2016) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S. Ct. 2041 (1973);

*Stallings v. State*, 508 N.E.2d 550, 552 (Ind. 1987)). "Authority to consent to a search can be either apparent or actual." *Gado v. State*, 882 N.E.2d 827, 832 (Ind. Ct. App. 2008), *trans. denied*. "Actual authority requires a sufficient relationship to or mutual use of the property by persons generally having joint access to or control of the property for most purposes." *Id.* at 999-1000 (citing *Halsema v. State*, 823 N.E.2d 668, 677 (Ind. 2005)). "The test for evaluating apparent authority is whether 'the facts available to the officer at the time would cause a person of reasonable caution to believe that the consenting party had authority over the premises.'" *Id.* at 1000 (quoting *Primus v. State*, 813 N.E.2d 370, 374-375 (Ind. Ct. App. 2004) (citing *Krise v. State*, 746 N.E.2d 957, 967 (Ind. 2001); *Trowbridge v. State*, 717 N.E.2d 138, 144 (Ind. 1999), *reh'g denied*)). The State bears the burden of proving that the third-party possessed the authority to consent. *Id.*

[16] The record reveals that Major Bridges testified that he spoke with the manager and she granted him consent to search the area and walked back through the food preparation area with him. Canfield does not dispute that the manager had the authority to consent to a search of the area under the wire shelving.

[17] With respect to Canfield's argument that he was illegally seized and the seizure requires that we find the search of the restaurant improper, we disagree. Not all encounters between law enforcement officers and citizens implicate the protections of the Fourth Amendment. *Clark v. State*, 994 N.E.2d 252, 261 (Ind. 2013). Consensual encounters in which a citizen voluntarily interacts with an officer do not compel Fourth Amendment analysis. *Id.* "Determining whether

this was a consensual encounter or some level of detention 'turns on an evaluation, under all the circumstances, of whether a reasonable person would feel free to disregard the police and go about his or her business.'" *Id.* (quoting *Finger v. State*, 799 N.E.2d 528, 532 (Ind. 2003)). "The test is objective—not whether the particular citizen actually felt free to leave, but 'whether the officer's words and actions would have conveyed that to a reasonable person.'" *Id.* (quoting *California v. Hodari D.*, 499 U.S. 621, 628, 111 S. Ct. 1547, 1551 (1991)). Furthermore, *United States v. Mendenhall* "establishes that the test for existence of a 'show of authority' is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person." *Hodari D.*, 499 U.S. at 628, 111 S. Ct. at 1551. Factors that might lead a reasonable person to conclude that he or she was not free to leave include the threatening presence of several officers, the display of a weapon by an officer, the physical touching of the person by an officer, or the use of language or tone of voice indicating that compliance with the officer's requests might be compelled. *Clark*, 994 N.E.2d at 261-262. However, the factors that go into determining whether a person would conclude that she is not free to leave "will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs." *Michigan v. Chesternut*, 486 U.S. 567, 573, 108 S. Ct. 1975, 1979 (1988). Nonconsensual encounters compel Fourth Amendment analysis and typically are viewed in two levels of detention: a full arrest lasting longer than a short period of time, or a brief investigative stop.

*Clark*, 994 N.E.2d at 261. "The former of these requires probable cause to be permissible; the latter requires a lower standard of reasonable suspicion." *Id.*

[18] The record reveals that Major Bridges asked Canfield if he could speak with him, Canfield said that he needed to tell his manager, and Major Bridges told him that was fine. Major Bridges testified that he asked Canfield if he would step outside so that they would not disrupt the business, and Canfield agreed to step outside. We also note that, while Canfield points to his testimony at the suppression hearing that Sergeant Wade told him that they were going to take him to jail if he did not cooperate, Sergeant Wade testified at the hearing that he did not threaten him or brandish a weapon and spoke to him in the same tone of voice as he was using in court.[2] Further, Major Bridges testified at the suppression hearing that he did not threaten him at any time and did not yell. We conclude that Canfield agreed to step outside in a consensual encounter and we cannot say that his rights under the Fourth Amendment were violated or that the trial court abused its discretion. *See Sellmer v. State*, 842 N.E.2d 358, 362 (Ind. 2006) (holding that a person is not seized within the meaning of the Fourth Amendment by police officers merely approaching an individual in a public place and asking if the person is willing to answer questions and holding that the defendant's constitutional rights did not appear to have been violated

---

[2] Neither Canfield nor Sergeant Wade testified at trial.

by an officer approaching her or requesting that she step outside to answer questions).

[19] To the extent Canfield asserts that the evidence found in the storeroom should have been suppressed under Indiana's doctrine of forced abandonment, we disagree. In *State v. Smithers*, the Indiana Supreme Court held that police may legally seize abandoned property but "where police action triggers the abandonment, that action must be lawful or the evidence will be considered obtained in an illegal search and seizure within the meaning of the Fourth Amendment." 256 Ind. 512, 515, 269 N.E.2d 874, 876 (1971). At the time that Canfield abandoned the methamphetamine, Major Bridges had merely asked him if he could speak with him, Canfield said that he needed to tell his manager, and Major Bridges told him that was fine. We cannot say that Major Bridges's actions at the time Canfield abandoned the methamphetamine were unlawful.

B. *Article 1, Section 11 of the Indiana Constitution*

[20] Article 1, Section 11 of the Indiana Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search or seizure, shall not be violated; and no warrant shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or thing to be seized.

[21] Although its text mirrors the Fourth Amendment, we interpret Article 1, Section 11 of our Indiana Constitution separately and independently. *Robinson v. State*, 5 N.E.3d 362, 368 (Ind. 2014). "When a defendant raises a Section 11 claim, the State must show the police conduct 'was reasonable under the totality of the circumstances.'" *Id.* (quoting *State v. Washington*, 898 N.E.2d 1200, 1205-1206 (Ind. 2008), *reh'g denied*). Generally, "[w]e consider three factors when evaluating reasonableness: '1) the degree of concern, suspicion, or knowledge that a violation has occurred, 2) the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities, and 3) the extent of law enforcement needs.'" *Id.* (quoting *Litchfield v. State*, 824 N.E.2d 356, 361 (Ind. 2005)).

[22] As for the degree of concern, suspicion, or knowledge that a violation had occurred, the record reveals an anonymous call which included a report of a male in a Taco Bell uniform who appeared to pull something from his waist that may have been an illegal substance and a description of the male. Major Bridges arrived at the restaurant within a couple of minutes and identified Canfield based upon the description that was given by dispatch and observed him digging around his waistband area and that he "kind of squatted down and then came back up shortly after" and "it was like he picked up something or had moved something." Transcript Volume II at 70. Major Bridges and Sergeant Wade both provided testimony regarding Canfield's behavior. Regarding the degree of intrusion, Major Bridges asked Canfield if he could speak with him and if he would step outside, and Canfield agreed. Major

Bridges received consent from the restaurant manager to search the area where Canfield was seen digging in his waistband and found a bag containing several smaller bags with white crystal powdery substance under wire shelving. With respect to law enforcement needs, the record reveals: the anonymous call regarding an item that may have been illegal substances being pulled from the waist of a male wearing a Taco Bell uniform; Major Bridges observed Canfield, who matched the description in the call, digging in his waistband; and Canfield's extremely nervous behavior. Under the totality of the circumstances, we conclude that the search was reasonable and did not violate Article 1, Section 11 of the Indiana Constitution. The trial court did not abuse its discretion in admitting the evidence.

## II.

[23] The next issue is whether the evidence is sufficient to sustain Canfield's conviction. Canfield claims that, while he certainly had access to the storeroom and used it to keep his belongings, the State did not present enough evidence to create a rational inference that he had constructive possession of the contraband.

[24] When reviewing the sufficiency of the evidence to support a conviction, appellate courts must consider only the probative evidence and reasonable inferences supporting the verdict. *Drane v. State*, 867 N.E.2d 144, 146 (Ind. 2007). It is the factfinder's role, not that of appellate courts, to assess witness credibility and weigh the evidence to determine whether it is sufficient to

support a conviction. *Id.* We will affirm unless no reasonable factfinder could find the elements of the crime proven beyond a reasonable doubt. *Id.* The evidence is sufficient if an inference may reasonably be drawn from it to support the verdict. *Id.* at 147.

[25] Ind. Code § 35-48-4-6.1 provides that "[a] person who, without a valid prescription or order of a practitioner acting in the course of the practitioner's professional practice, knowingly or intentionally possesses methamphetamine (pure or adulterated) commits possession of methamphetamine" and "[t]he offense is a Level 5 felony if . . . the amount of the drug involved is less than five (5) grams and an enhancing circumstance applies." Ind. Code § 35-48-1-16.5 defines "[e]nhancing circumstance" as including "[t]he person has a prior conviction, in any jurisdiction, for dealing in a controlled substance that is not marijuana, hashish, hash oil, salvia divinorum, or a synthetic drug, including an attempt or conspiracy to commit the offense."

[26] It is well-established that possession of an item may be either actual or constructive. *See Lampkins v. State*, 682 N.E.2d 1268, 1275 (Ind. 1997), *modified on reh'g*, 685 N.E.2d 698 (Ind. 1997). Constructive possession occurs when a person has: (1) the capability to maintain dominion and control over the item; and (2) the intent to maintain dominion and control over it. *Id.* The capability element of constructive possession is met when the State shows that the defendant is able to reduce the contraband to the defendant's personal possession. *Goliday v. State*, 708 N.E.2d 4, 6 (Ind. 1999).

[27] The intent element of constructive possession is shown if the State demonstrates the defendant's knowledge of the presence of the contraband. *Id.* A defendant's knowledge may be inferred from either the exclusive dominion and control over the premises containing the contraband, or, if the control is non-exclusive, evidence of additional circumstances pointing to the defendant's knowledge of the presence of contraband. *Id.* These additional circumstances may include: "(1) a defendant's incriminating statements; (2) a defendant's attempting to leave or making furtive gestures; (3) the location of contraband[-]like drugs in settings suggesting manufacturing; (4) the item's proximity to the defendant; (5) the location of contraband within the defendant's plain view; and (6) the mingling of contraband with other items the defendant owns." *Gray v. State*, 957 N.E.2d 171, 175 (Ind. 2011). The State is not required to prove all additional circumstances when showing that a defendant had the intent to maintain dominion and control over contraband. *See Gee v. State*, 810 N.E.2d 338, 344 (Ind. 2004) (explaining that the additional circumstances "are not exclusive" and that "the State is required to show that whatever factor or set of factors it relies upon in support of the intent prong of constructive possession, those factors or set of factors must demonstrate the probability that the defendant was aware of the presence of the contraband and its illegal character").

[28] On appeal, Canfield acknowledges that the anonymous call included a report regarding a male in a Taco Bell uniform who appeared to pull something from his waist, a description of the male, and a report that the item may have been

illegal substances. Major Bridges observed Canfield stand off to the left side of the food preparation area and "appeared to be digging around his waistband area." Transcript Volume II at 70. He heard something fall at one point which he later determined was a pizza box, and Canfield "kind of squatted down and then came back up shortly after" and "it was like he picked up something or had moved something." *Id.* Major Bridges went back where Canfield was seen digging in his waistband, looked down under a wire rack, and saw a bag containing several smaller bags with white crystal powdery substance inside about six to seven inches under the shelving, which later tested positive for methamphetamine and weighed 4.23 grams. Further, after being Mirandized, Canfield requested to speak to a drug detective or somebody that he could work with "advising that the items found had came from the plug or the source, that he can get some big players . . . ." *Id.* at 84. Major Bridges also testified that at some point in time he asked Canfield how much he thought he had on him at the time, and he said three grams or so. The court admitted evidence that Canfield had a prior conviction for dealing in methamphetamine as a class B felony.

[29] We conclude that the State presented evidence of probative value from which a reasonable trier of fact could have found that Canfield committed the offense of possession of methamphetamine as a level 5 felony, and his arguments amount to an invitation to reweigh the evidence.

[30] For the foregoing reasons, we affirm Canfield's conviction.

Affirmed.

May, J., concurs.

Mathias, J., concurs with separate opinion.

# IN THE
# COURT OF APPEALS OF INDIANA

Kristapher D. Canfield,
*Appellant-Defendant*,

v.

State of Indiana,
*Appellee-Plaintiff*.

Court of Appeals Case No.
18A-CR-3124

**Mathias, Judge, concurring.**

I concur fully with my colleagues in this case. The law and cases cited are exactly correct.

I write only to state the obvious. While Canfield's agreement to meet the uniformed officer outside his place of employment amounts to a consensual encounter under the law, the fact of the matter is that few Hoosiers are aware of their right to refuse to speak with a uniformed law enforcement officer under circumstances like Canfield faced in this case, other than to provide identification. This is similar to the law regarding the circumstances faced by Hoosiers in a roadside traffic stop. *See R.H. v. State*, 916 N.E.2d 260 (Ind. Ct. App. 2009) (Mathias, J., concurring), *trans. denied*; *Overstreet v. State*, 724 N.E.2d 661 (Ind. Ct. App. 2000) (Robb, J., dissenting).