Christina GALVIN and James E. McDaniel, Appellants–Defendants,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 12A02–9006–CR–363 [1].

Court of Appeals of Indiana, Fifth District.

Dec. 9, 1991.

Transfer Denied March 4, 1992.

---

1. This case has been diverted to this office by order of the Chief Judge.

Richard D. Martin, Miller & Martin Law Office, Frankfort, for appellant-defendant Galvin.

David E. Cook, Samper Hawkins Atz & Cook, Indianapolis, for appellant-defendant McDaniel.

Linley E. Pearson, Atty. Gen., Geoff Davis, Deputy Atty. Gen., Indianapolis, for appellee-plaintiff.

BARTEAU, Judge.

Christina Galvin and James McDaniel were both convicted of the following:

Count I–Possession of Cocaine, a class A felony;

Count II–Possessing Cocaine with Intent to Deliver, a class A felony;

Count III–Possession of Marijuana, a class D felony;

Count IV–Maintaining a Common Nuisance, a class D felony; and

Count V–Possession of Paraphernalia, a class D felony.

They were tried together and their appeals have been consolidated. Galvin and McDaniel both raise several issues, however, because we reverse, we need only address the issue whether the trial court erroneously admitted evidence found pursuant to an illegal search.

### FACTS

An undercover police operation to purchase cocaine led to the arrests of Galvin and McDaniel, though neither of the two were targets of the operation. An undercover state trooper, Trooper Neal, made a deal to purchase cocaine through Larue C. (Butch) Casey. Trooper Neal gave Casey $1,350.00 to buy the drugs, dropped him off in Jefferson, Indiana, and then waited in a nearby restaurant parking lot for Casey to return. The buy money had been dusted with a phosphorescent powder.

The undercover operation included a surveillance aircraft, from which State Trooper Butler observed Casey and a man later identified as Blick Loveless drive a red truck to Frankfort, Indiana. Casey and Loveless made two stops at Galvin's home and a stop at a Village Pantry. The surveillance team lost track of Casey and Loveless for twenty to thirty minutes and did not know how Casey returned to Jefferson. However, when Casey returned to Trooper Neal's car, he handed Neal a plastic bag containing cocaine. Casey was arrested and Neal directed several officers to secure Galvin's home while he and Trooper Butler went to obtain a search warrant. However, the Clinton Circuit Court denied the search warrant request.

In the meantime, six to ten officers from the Indiana State Police, the Frankfort Police Department and the Tippecanoe County Sheriff's Department arrived to secure the Galvin home. The officers secured the home by entering the screened front porch and proceeding directly into the living room through an open door. The officers could not remember if any of them knocked before they entered. Neither Galvin nor McDaniel heard any officer knock before entering and did not invite the officers into their home. Once inside, the officers detained Galvin, McDaniel and McDaniel's son in the living room. When McDaniel questioned whether the officers had a search warrant, they told him that one was on the way. McDaniel asked to call his lawyer, but Galvin and McDaniel were not allowed to use the phone, take a shower or answer the phone when it rang; the officers required them to just sit in the living room. Before Trooper Neal arrived, one of the officers securing Galvin's home ran a black light over the hands of Galvin, McDaniel and McDaniel's son to see if any of them had handled the money given by Trooper Neal to Casey. Each one consented to this search, which produced negative results.

When Trooper Neal arrived about an hour after the house had been "secured", he ascertained that Galvin owned the house, and that McDaniel lived there with Galvin. Neal proceeded to explain to Galvin the events surrounding the drug buy and that he had reason to believe there was cocaine in her house. He then sought her consent to search the house. He never mentioned that the trial court had denied his request for a search warrant, and he at

no time advised Galvin or McDaniel that they had the right to talk to an attorney before giving consent to search. Neal did advise Galvin, however, that she did not have to consent to the search, that if she did consent to the search the officers would not damage anything, and that she was free to leave at anytime—apparently forgetting that Galvin was in her own home. After consulting with McDaniel, Galvin consented to the search but refused to sign a consent form and did not read the consent form. Upon searching the home, the police seized cocaine, marijuana, drug paraphernalia and cash, including the marked bills given to Casey by Trooper Neal. Subsequently, Galvin and McDaniel were arrested. Galvin and McDaniel were not arrested on any charges in connection with the earlier controlled drug transaction.

Before trial, Galvin and McDaniel moved to suppress the items found in their home. The trial court denied the motions and denied their objections at trial to the admission of this evidence.

## DISCUSSION

Galvin and McDaniel contend that their motions to suppress should have been granted because the police officers made an illegal entry into their home and conducted a search without a warrant or a valid consent.

The State contends that McDaniel does not have standing to object to an invalid consent because it was Galvin, not McDaniel, who consented to the search, and at any rate the consent to search was valid.

The State's assertion that McDaniel does not have standing is unfounded. He clearly had a possessory interest in the house and the evidence seized—indeed, at trial the State went to great lengths to prove a possessory interest in order to prove the case against McDaniel.

Galvin and McDaniel argue that the evidence seized at the house is inadmissible as "fruit of the poisonous tree" because the police officers made an illegal entry, tainting Galvin's consent to search. The facts here are very similar to those in *U.S. v. Howard* (9th Cir.1987), 828 F.2d 552. In

*Howard* the police secured a home believed to house an illegal drug laboratory by running toward the house yelling "police officers" and entering with their guns drawn. The officers required the occupants of the house to lay on the floor for over half an hour. After that, the occupants were allowed to sit on the couch. The owner of the house was taken into another room by police officers who explained the reason for seizing the residence. One of the officers then read the owner her *Miranda* rights and she signed a consent to search form. The police did not have a search warrant for the home, no facts supported probable cause to secure the residence, and no facts supported an exigent circumstances theory. Consequently, the Ninth Circuit found that the entry into the home was illegal and the consent to search subsequently obtained was tainted and therefore invalid. *Howard, supra.*

■ Likewise, here, the officers did not have a search warrant, probable cause to search did not exist and no exigent circumstances existed. Accordingly, the officers' uninvited entry into Galvin's house was illegal. The State conceded at oral argument that the entry into the home was unreasonable. However, the State argues that Galvin's subsequent consent was the product of an independent source and not the product of the illegal entry, citing *Snellgrove v. State* (1991), Ind., 569 N.E.2d 337.

In *Snellgrove,* the defendant was unlawfully arrested in his home without an arrest warrant. Before being taken to the police station, he was advised of his right to remain silent and to have counsel. At the police station he was again advised of his constitutional rights and he signed a form acknowledging that he had been advised of his rights and understood them. He indicated that he did not want to talk and was placed in a holding cell. When an officer came to get a final fingerprint from the defendant, the defendant asked the officer if his co-defendant was cooperating. The officer replied that she was and played a recording of her statement for the defendant. The defendant then confessed.

In determining whether Snellgrove's signed waiver form and oral confession were improperly admitted into evidence as fruits of the illegal arrest, the relevant inquiry for the court was

> whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.

*Snellgrove, supra* at 341 (quoting *Wong Sun v. United States* (1963), 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441, 455). The court in *Snellgrove* also identified several factors that are to be considered in addressing this issue:

> [reading of the *Miranda* warnings,] the temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly the purpose and the flagrancy of the official misconduct.... The voluntariness of the statement is a threshold requirement.

*Snellgrove, supra* at 342 (quoting *Brown v. Illinois* (1975), 422 U.S. 590, 603–04, 95 S.Ct. 2254, 2261–62, 45 L.Ed.2d 416, 427 (footnote omitted)) (citations omitted).

The court concluded that Snellgrove's decision to confess was a product of his free will and not the product of his illegal arrest, citing the absence of any evidence suggesting purposeful police misconduct coupled with the frequent issuance of *Miranda* warnings and the conduct of the police in respecting appellant's initial assertion of his privilege to refuse to answer questions. *Snellgrove, supra* at 343.

■ The case at issue is clearly distinguishable from *Snellgrove* and instead similar to the facts in *Howard, supra*. Here, within an hour after the police made an unlawful entry into Galvin's home, and with the six to ten officers still present, Galvin was requested to give her consent to a search without being told that the court had refused to give the officers a search warrant. There were no intervening circumstances between the time the officers entered the home and the request for the consent, other than the arrival of Trooper Neal. Galvin at no time was advised of her right to speak to an attorney, even though she had been detained for over an hour. Furthermore, this is not a case where the officers had probable cause to search the house and exigent circumstances justified the warrantless search. Here, the officers did not even have probable cause when they entered the home uninvited and detained the occupants for over an hour. We cannot overlook the inherent coercive effect such an intrusion would have on Galvin's decision to consent to a search.

Under the facts and circumstances of this case, we cannot say that Galvin's consent was given voluntarily and independent of the illegal entry. Accordingly, we hold that her consent was a product of the illegal entry and therefore not valid. Consequently, the subsequent search was illegal and the evidence derived from it should not have been admitted. Each of the convictions of Galvin and McDaniel are reversed.

REVERSED.

MILLER, J., concurs.

RUCKER, J., dissents with opinion.

RUCKER, Judge, dissenting.

I respectfully dissent. Although the entry by the police was unreasonable, the evidence of record shows Galvin's subsequent consent to the search was made voluntarily and was not a product of that entry. Therefore, the trial court's determination that the evidence derived from the search was admissible should be upheld.

In *United States v. Howard* (9th Cir. 1987), 828 F.2d 552, a federal case on which the majority relies, the court refused to consider the voluntariness of the defendant's consent to a search because the consent was viewed as irrevocably tainted by the prior illegal entry. Because precedent binding on this court mandates a more flexible stance than that adopted by the court in *Howard*, I believe the reliance by the majority on that case to be misplaced.

The fact Galvin's consent to the search was preceded by an illegal entry does not foreclose the inquiry as to the admissibility

of the evidence derived from the search. Indiana courts are bound by *Snellgrove v. State* (1991), Ind., 569 N.E.2d 337, 341 to consider:

> whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.

quoting *Wong Sun v. United States* (1963), 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441, 455. Therefore, the voluntariness of Galvin's consent becomes the critical inquiry, whether it "was sufficiently an act of free will to purge the primary taint of the unlawful invasion." *Wong Sun*, 371 U.S. at 486, 83 S.Ct. at 416–417; 9 L.Ed.2d at 455.

The question of whether Galvin's consent to the search was voluntary, or a product of the illegal entry, is one which may be answered only on the facts of this case. There is no talismanic test; no single fact is dispositive. *See Brown v. Illinois* (1975), 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416. Similarly, Indiana courts have long recognized that whether a consent to search was made voluntarily is a question of fact turning on the "totality of the circumstances." *Cato v. State* (1979), 272 Ind. 102, 108–09, 396 N.E.2d 119, 123. Our standard of review in making this determination requires we consider all the evidence favorable to the judgment together with any uncontradicted adverse evidence and uphold the trial court if its ruling is supported by the evidence. *Bruce v. State* (1978), 268 Ind. 180, 375 N.E.2d 1042, *cert. denied* (1978), 439 U.S. 988, 99 S.Ct. 586, 58 L.Ed.2d 662; *Weaver v. State* (1990), Ind.App., 556 N.E.2d 1386.

Contrary to the view of the majority, the totality of the circumstances of this case compels a finding that the effects of the illegal entry were sufficiently attenuated by the intervening circumstances such that Galvin's consent must be deemed an independent product of her free will. After Officer Neal arrived, he explained to Galvin she was not under arrest and she was free to go if she wished. He also explained that she was under no obligation to consent to a search, and that criminal charges could be filed against her or others living at her residence if evidence of a crime was uncovered by the search.

A factor also overlooked by the majority was the congeniality of the interaction between the police, Galvin and McDaniel. The majority emphasizes the foreboding presence of the police officers at the Galvin home but does not note that Galvin and McDaniel were allowed to speak privately before Galvin consented to the search. Indeed, the atmosphere of the discussion preceding Galvin's consent was so relaxed McDaniel thanked Officer Neal for being polite.

The impact of such congeniality is an important factor in determining whether a consent to a search is voluntary. *Schneckloth v. Bustamonte* (1973), 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854. Moreover, unlike whether *Miranda* warnings are given, such factual considerations as the emotional tone of an interaction are difficult to evaluate from the vantage point of a cold record. Consistent with our standard of review, we must give deference to the trial court in reaching a determination on a highly fact sensitive issue like that of voluntariness. *Cato, supra.*

Also, as in *Snellgrove*, the police activity here did not rise to the level of purposeful or flagrant police misconduct, a factor particularly emphasized in *Brown*. The majority does not assert the illegal entry was undertaken by the police in bad faith and the record would not uphold such a finding. Officer Neal's subsequent conduct revealed none of the intent to exploit the prior illegal entry that so troubled the court in *Brown*.

The majority is appropriately concerned with the inherently coercive effect of the illegal entry. However, a simple *per se* test, rendering inadmissible the fruits of all consensual searches conducted after an illegal entry, was squarely rejected in *Wong Sun. See Brown, supra.* The foregoing cases, as recognized in *Snellgrove*, dictate we must recognize all the facts surrounding the consent; our attention should not

be directed solely by the illegality of the initial entry.

My examination of the totality of the circumstances of Galvin's consent leaves me convinced that the primary taint was sufficiently purged. The facts here support the trial court's decision. Accordingly, I dissent.