

FILED

Jul 06 2020, 8:51 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Marietto V. Massillamany
Erica Guernsey
Massillamany Jeter & Carson LLP
Fishers, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Megan M. Smith
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Robert Shorter,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff* | July 6, 2020<br><br>Court of Appeals Case No.<br>19A-CR-2904<br><br>Appeal from the Madison Circuit Court<br><br>The Honorable David A. Happe, Judge<br><br>Trial Court Cause No.<br>48C04-1807-F2-1909 |

**Baker, Judge.**

[1] Robert Shorter appeals his convictions for Level 2 Felony Dealing in Methamphetamine,[1] Level 3 Felony Dealing in a Narcotic Drug,[2] Level 3 Felony Conspiracy to Commit Dealing in a Narcotic Drug,[3] and Level 3 Felony Aiding, Inducing, or Causing Dealing in Methamphetamine.[4] He argues that (1) the trial court erred in its decision to admit certain evidence, thereby violating both the Fourth Amendment to the United States Constitution and Article 1, Section 11 of the Indiana Constitution, and (2) the evidence was insufficient to support the conviction. Finding no error and that the evidence was sufficient, we affirm.

## Facts

[2] In June 2018, the Anderson Police Department received an anonymous complaint that Shorter and Lewis Martin had traveled from Detroit to Anderson to sell drugs. On July 18, 2018, a confidential informant for the Anderson Police Department contacted Shorter to purchase methamphetamine. Shorter at first agreed to sell the informant methamphetamine, but later informed her that he could only sell her heroin and told her to contact Martin if she wanted methamphetamine. Shorter gave the informant Martin's contact information and put her in touch with Martin so she could arrange a purchase

---

[1] Ind. Code § 35-48-4-1.1(a)(2).

[2] I.C. § 35-48-4-1(a)(2).

[3] Ind. Code § 35-41-5-2.

[4] I.C. § 35-41-2-4.

of methamphetamine from him. Later that same day, per Martin and the informant's arrangement, the informant met Martin at the predetermined location and gave him $200 in exchange for seven grams of methamphetamine.

[3] The same day, after this first transaction, the informant contacted Shorter again requesting to purchase heroin. Shorter agreed to sell seven grams and gave the informant a residential address where she would meet him to purchase the heroin. The informant went to the address and met up with Shorter; the two went into the kitchen, where Shorter removed a package of drugs from a cabinet, weighed out the seven grams he had agreed to sell, and then exchanged the heroin for money from the informant. Following the exchange, Shorter "made [the informant] do the heroin" that was left sitting on the table, and though she tried to "wipe[] it off the table without him knowin'," she did end up "gettin' some in [her] nose." Tr. Vol. III p. 42-43. As a result, after the buy, officers immediately transported the informant to be medically examined.

[4] On July 23, 2018, Shorter called the informant asking for help "to get him out of town." *Id.* at 45. He told her he "was scared and paranoid" and that he "knew everybody was looking for him because . . . all [his] locations had . . . been hit," and he wanted "someone he could trust" to help him leave town. *Id.* Shorter disclosed his location, which the informant then provided to officers. When officers arrived at the location, the front door was open and they could observe Shorter, who was still wearing the same clothing he wore when he sold heroin to the informant, sitting on a couch inside. The officers surveilled and observed him for about twenty to thirty minutes before Shorter exited the

residence, walked a few feet toward a detached garage while "looking very intently at the ground," and eventually stopped and bent over a few feet away from the garage, in a manner "very similar to someone who was bent over . . . tying their shoes but you just couldn't see [his] hands." *Id.* at 114-15. Shorter then stood up and walked back into the residence.

[5] Officers on the scene continued observing the residence for another fifteen minutes or so until additional uniformed officers arrived; during that time, nobody else was observed entering or exiting the residence. Once the additional officers arrived, officers approached the residence and instructed Shorter to put his hands up, at which point Shorter complied and stood up, and "threw a large amount of money up in the air" that had been in his hands. *Id.* at 10. Officers then arrested Shorter without incident.[5]

[6] Holly Brewer, the primary resident of the home at which officers apprehended Shorter, consented to a search of the residence. A K-9 unit conducted a sweep of the exterior of the residence and the K-9 alerted at a spot outside the detached garage, around the place where officers had observed Shorter bent over. Officers noticed that a rock or stepping stone where the K-9 alerted "wasn't in the ground like the rest of em'" and turned it over, discovering

---

[5] It is not entirely clear from the record whether Shorter and the police officers were inside or outside of the residence during his arrest, though an officer testified that just prior to the arrest, as the officers approached the door, they "had a visual contact [with Shorter] . . . cause the door was wide open." Tr. Vol. III p. 10. Once Shorter saw the officers approaching, he threw up the money that was in his hands and followed officers' orders to be taken into custody. To err on the side of protecting Shorter's constitutional rights, we will assume that the arrest took place inside the home.

underneath it a sock containing a bag of methamphetamine and a bag of a mixture of heroin and diphenhydramine. *Id.* at 88. A search inside the residence produced a digital scale with white residue on it and baggies on the table where Shorter had been sitting.

[7] Officers had been unable to obtain a warrant for Shorter's arrest after the controlled heroin buy because they had no personal identifiers for Shorter necessary for obtaining a warrant.[6] Officers nonetheless believed they had probable cause to arrest Shorter based on the controlled buy. In an interview with officers, Shorter provided a false name and identification and made several incriminating statements. *See id.* at 216-28. After being told that the interviewing detective was working narcotics, Shorter admitted that he knew Martin, knew where Martin was located, and that Martin "brought [him] down here" and "made [him] work." *Id.* at 217. The detective told Shorter he would be charged with dealing heroin and that officers had purchased heroin from him, to which Shorter merely responded "[s]h*t." *Id.* at 222. Shorter never denied selling the drugs, and instead told the detective that he "didn't deal[] to you man" and "you don't look like nobody I sellin' that to." *Id.* at 222, 228.

[8] On July 25, 2018, the State charged Shorter with one count of Level 2 felony dealing in methamphetamine, two counts of Level 3 felony dealing in a narcotic drug, and one count of Level 6 felony identity deception. On October 20, 2018,

---

[6] At that point, officers had known Shorter only by various street names, not his legal name.

the State filed an amended charging information alleging that Shorter was an habitual offender. On January 29, 2019, the State filed a motion to amend the charging information, which the trial court granted, that amended one count of dealing in a narcotic drug to Level 3 felony conspiracy to commit dealing in a narcotic drug and added a charge of Level 3 felony aiding, inducing, or causing dealing in methamphetamine. On September 16, 2019, the State moved to dismiss the identity deception charge, which the trial court granted.

[9] A jury trial was held September 16 and 18, 2019. Shorter filed a motion to suppress certain statements and evidence surrounding his arrest, and the trial court denied the motion. At the conclusion of the trial, outside the presence of the jury, the State chose to not proceed with the habitual offender enhancement. The jury found Shorter guilty of all other remaining charges: Level 2 felony dealing in methamphetamine, Level 3 dealing in a narcotic drug, Level 3 felony conspiracy to commit dealing in a narcotic drug, and Level 3 felony aiding, inducing, or causing dealing in methamphetamine. On November 12, 2019, the trial court sentenced Shorter to twenty-three years for dealing in methamphetamine and ten years each for the three Level 3 felony convictions, all to run concurrently, for an aggregate sentence of twenty-three years in the Department of Correction. Shorter now appeals.

# Discussion and Decision

# I. Admission of Evidence

[10] Shorter's first argument on appeal is that the trial court erred when it denied his motion to suppress and admitted evidence obtained as a result of his warrantless arrest and the warrantless search of Brewer's home, thereby violating both the Fourth Amendment to the U.S. Constitution and Article 1, Section 11 of the Indiana Constitution.

[11] Because Shorter is appealing the denial of the motion to suppress after a completed trial, the appeal is best framed as one challenging the trial court's admission of evidence. *Clark v. State*, 994 N.E.2d 252, 259 (Ind. 2013). Admission or exclusion of evidence is within the trial court's sound discretion and is given great deference on appeal. *Hall v. State*, 36 N.E.3d 459, 466 (Ind. 2015). We will reverse a trial court's ruling on the admissibility of evidence only if the decision is clearly against the logic and effect of the facts and circumstances or if the trial court has misinterpreted the law. *Id.* When a challenge to a trial court's ruling on the admissibility of evidence turns on an alleged constitutional violation, as it does here, the issue raises a question of law and our review is de novo. *E.g.*, *Pinner v. State*, 74 N.E.3d 226, 229 (Ind. 2017).

# A. Fourth Amendment

[12] With regards to the Fourth Amendment, Shorter argues that the warrantless arrest and search of the home were unconstitutional and that certain evidence

obtained from the arrest and search should have been suppressed. More specifically, Shorter contends that law enforcement violated Shorter's reasonable expectation of privacy guaranteed by the Fourth Amendment "when they entered [Shorter's] temporary home, absent exigent circumstances, and without a warrant to search and seize him." Appellant's Br. p. 12. As a result, he claims, "statements Shorter made at the police station following his arrest and the drugs found in Brewer's yard under a rock" were improperly admitted as evidence by the trial court. Appellant's Reply Br. p. 5.[7]

[13] The Fourth Amendment to the U.S. Constitution provides, in relevant part, that "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated; and no warrant shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." While in most cases, probable cause to believe the person being arrested committed a felony is sufficient to support a warrantless arrest, "[p]robable cause alone is insufficient to justify a warrantless arrest of a person in his home." *Snellgrove v. State*, 569 N.E.2d 337, 340 (Ind. 1991). Instead, there must also be exigent circumstances present, which are traditionally found where

---

[7] As an initial matter, the warrantless search of Brewer's home was constitutional because Brewer, the owner, consented to the search. Before obtaining her consent for the search, officers reviewed her rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), and *Pirtle v. State*, 263 Ind. 16, 323 N.E.2d 634 (1975). Importantly, it was this search, not Shorter's warrantless arrest or a search conducted incident to that arrest, that resulted in the discovery of the methamphetamine and heroin. Therefore, regardless of the circumstances surrounding Shorter's warrantless arrest, the warrantless search of the home was supported by valid consent, meaning that the drugs discovered during that search were properly seized by officers and properly admitted as evidence.

"1) a suspect is fleeing or likely to take flight in order to avoid arrest; 2) incriminating evidence is in jeopardy of being destroyed or removed unless an immediate arrest is made; and 3) in cases that involve hot pursuit or movable vehicles." *Id.*

[14] With regards to the warrantless arrest, ample exigent circumstances justifying the arrest were present. Shorter had contacted the confidential informant seeking help "to get him out of town" and told the informant that "he knew everybody was looking for him." Tr. Vol. III p. 45. Furthermore, officers knew that Shorter had come from Michigan to sell drugs and had few ties to the local community. *See, e.g.*, *Myers v. State*, 454 N.E.2d 861, 864 (Ind. 1983) (finding exigent circumstances existed and that defendant was likely to flee the state before an arrest warrant could be issued where defendant's truck had an out-of-state plate, he provided an out-of-state address at his hotel, he had "little or no ties in Indiana," and he had committed other criminal offenses in other states).

[15] Additionally, officers had audio recordings of Shorter arranging drug purchases with the informant and video footage of him selling heroin to the informant, and they were able to identify him on the day of his arrest based on this information. Officers were unable to procure an arrest warrant only because they did not know the required personal identifying information (i.e., his real name, as opposed to various street names). Where "exigent circumstances [make] the procuring of a warrant impracticable" and probable cause otherwise exists, a warrantless arrest is reasonable. *Banks v. State*, 265 Ind. 71, 77-78, 351 N.E.2d 4, 9 (1976) (finding warrantless arrest was lawful where "[p]olice . . .

had information from two informants, one of whom was an eyewitness, [upon] which their arrest . . . was based").[8]

[16] Lastly, we also note that the door to the home was "wide open with no screen"[9] and Shorter was sitting on a couch located directly in front of the open door, such that Shorter was plainly visible and identifiable from lawful vantage points, including from a vehicle as officers first drove by the house. Tr. Vol. III p. 142, 224. These circumstances certainly reduced the reasonable expectation of privacy Shorter had inside the home in the first place. *See, e.g.*, *Shane v. State*, 615 N.E.2d 425, 428 (Ind. 1993) (holding that defendant had no reasonable expectation of privacy in a basement area where door to the basement was off its hinge and was accessible via a common stairwell); *Sayre v. State*, 471 N.E.2d 708, 713 (Ind. Ct. App. 1984) ("[D]efendants did not display a reasonable expectation of privacy by leaving open the curtains on the front window, which is only a few feet from the front door."); *see also Cox*, 696 N.E.2d at 857 ("[I]f

---

[8] Shorter compares the facts surrounding his case to those in *Kirk v. Louisiana*, 536 U.S. 635 (2002), to support his argument that despite the presence of probable cause, there are no exigent circumstances present that could have justified his warrantless arrest and the admission of any evidence obtained thereafter. In *Kirk*, the police had probable cause that a drug deal had taken place in the defendant's apartment and arrested the defendant there without a warrant. The United States Supreme Court reversed the appellate court's judgment that the warrantless arrest was proper because there was no finding below of exigent circumstances in addition to probable cause. But *Kirk* makes no finding on whether exigent circumstances actually existed in that case; in fact, the opinion clearly states that it "express[es] no opinion on that question," and instead holds merely that the lower court erred by holding that exigent circumstances were not required to justify a warrantless arrest of an apartment home. *Id.* at 638.

[9] The presence of a closed screen door, despite an otherwise open doorway, has been noted as a key distinction in whether warrantless entry of a home in "threshold arrests" is constitutional. *See, e.g.*, *Cox v. State*, 696 N.E.2d 853, 857 (Ind. 1998) (finding that "where an intervening screen or storm door remains closed" when a suspect is in the threshold of the home, the integrity of the physical boundaries of the home are nonetheless preserved, along with the ability to exclude others).

police spot the suspect and identify themselves when the suspect is in view, they may pursue her into the home to complete the arrest."); *Boggs v. State*, 928 N.E.2d 855, 863 (Ind. Ct. App. 2010) ("A man's home is, for most purposes, a place where he expects privacy, but objects, activities, or statements that he exposes to the plain view of outsiders are not protected because no intention to keep them to himself has been exhibited.").

[17] In sum, we find that the warrantless arrest of Shorter was supported by probable cause and exigent circumstances, and that the warrantless search that produced the heroin and methamphetamine introduced as evidence was lawful. Given the particular facts of this case, it would have been advisable and best practice for officers to at least attempt to obtain an electronic warrant prior to the arrest, but because there were sufficient exigent circumstances consistent with those found in cases like *Myers* and *Banks*, a warrant was not required. As such, no Fourth Amendment violation occurred, and the trial court properly admitted any evidence obtained as a result of the arrest or the search of the home.[10]

---

[10] Shorter makes an additional argument that the challenged evidence admitted at trial—Shorter's statements to police and the drugs found at Brewer's residence—were not sufficiently attenuated from the alleged police misconduct (i.e., the warrantless search and seizure) and therefore were required to be suppressed. *See, e.g.*, *Joseph v. State*, 975 N.E.2d 420, 426-30 (finding, under the attenuation doctrine, that defendant's statements to officers after an unconstitutional search of his apartment were not sufficiently attenuated to be admissible at trial). But for the attenuation doctrine to apply, there must first be some illegal police conduct. *See id.* at 426  Because we find that no police misconduct occurred and that the warrantless search and seizure was constitutional, we decline to address the attenuation argument in more depth.

# B. Article 1, Section 11

Next, we must consider whether the warrantless arrest violated the Indiana Constitution.[11] Under Article 1, Section 11 of the Indiana Constitution, the legality of a seizure "turns on an evaluation of the reasonableness of the police conduct under the totality of the circumstances." *Litchfield v. State*, 824 N.E.2d 356, 359 (Ind. 2005). Whether a seizure is reasonable focuses on the actions of the officer, rather than on the defendant's reasonable expectation of privacy, and "turn[s] on a balance of: 1) the degree of concern, suspicion, or knowledge that a violation has occurred, 2) the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities, and 3) the extent of law enforcement needs." *Id.*

First, we recognize the particularly high degree of intrusion here: "Indeed, there are few intrusions more severe than an arrest." *Govan v. State*, 116 N.E.3d 1165, 1175 (Ind. Ct. App. 2019), *trans. denied*. But because we find that both the degree of suspicion and extent of law enforcement needs were also particularly high, we nonetheless conclude that the balance of *Litchfield* factors shows that the warrantless arrest of Shorter was reasonable under the Indiana Constitution.

Regarding the degree of concern, suspicion, or knowledge of a violation, we look at "the reasonableness of the officers' assumptions, suspicions, or beliefs

---

[11] As under the United States Constitution, a homeowner's consent to the search of her property renders the search constitutional. *E.g.*, *Campos v. State*, 885 N.E.2d 590, 600 (Ind. 2008). Therefore, we need not consider Shorter's arguments related to the search of the residence.

based on the information available to them at the time." *Duran v. State*, 930 N.E.2d 10, 18 (Ind. 2010). Shorter admits that "[h]ere, the degree of concern and knowledge that a violation had occurred was high." Appellant's Br. p. 9-10. Officers had successfully conducted two controlled buys from Shorter and Martin, corroborating the original anonymous tip that the two were in town from Michigan to sell drugs, and had audio and video recordings of Shorter of his interactions with a reliable confidential informant. *See Herron v. State*, 991 N.E.2d 165, 171 (Ind. Ct. App. 2013) (finding warrantless search and seizure was reasonable under the Indiana Constitution where officers and a confidential informant conducted two controlled drug purchases that corroborated an anonymous tip and officers saw "what appeared to be the buy money" in plain view in defendant's car).

[21] Lastly, the extent of law enforcement needs was high here given Shorter's indication that he intended to flee. Shorter's statements to the informant about needing to get out of town, combined with officers' knowledge that Shorter was from Michigan and dealing large quantities of drugs, indicated that there was a high need to secure Shorter as soon as possible before he left the area. Shorter attempts to draw parallels between the facts of his case and those in *State v. Foster*, 950 N.E.2d 760 (Ind. Ct. App. 2011), where we held that a warrantless arrest was unreasonable in violation of Article 1, Section 11 in part because of the lack of law enforcement needs. In *Foster*, however, officers did not arrest the defendant until twenty-one days after the controlled drug buy, during which time the defendant stayed living in his own apartment. Here, only five days had

passed between the last controlled buy and the date of Shorter's arrest, he was not staying in his own permanent home, and officers had received information via the confidential informant that Shorter had expressed interest in leaving the state soon. Unlike in *Foster*, where "[t]here was ample time and opportunity for the officers to obtain an arrest warrant," the officers here needed to act quickly and had a high need for conducting the warrantless arrest in light of the facts and circumstances. *Id.* at 762.

As such, we find that a balance of the three *Litchfield* factors support a conclusion that the warrantless arrest of Shorter was reasonable under Article 1, Section 11 of the Indiana Constitution, and that the trial court did not err in admitting evidence of Shorter's statements to officers following his arrest.

## II. Sufficiency of the Evidence

Shorter next argues that, regardless of the admissibility of the challenged evidence, the evidence was insufficient to support his convictions. In reviewing the sufficiency of the evidence to support a conviction, we must consider only the probative evidence and the reasonable inferences supporting the verdict, and we will neither assess witness credibility nor reweigh the evidence. *Drane v. State*, 867 N.E.2d 144, 146 (Ind. 2007). We will affirm unless no reasonable factfinder could find the elements of the crime proved beyond a reasonable doubt. *Id.*

## *Dealing Convictions*

To convict Shorter of dealing in methamphetamine, the State was required to prove that on July 23, 2018, Shorter possessed pure or adulterated methamphetamine with the intent to deliver it or to finance the delivery of it. I.C. § 35-48-4-1.1(a)(2). Similarly, to convict him of dealing in a narcotic drug, the State was required to prove that on July 23, 2018, Shorter possessed pure or adulterated heroin with the intent to deliver it or to finance the delivery of it. I.C. § 35-48-4-1(a)(2).

Shorter argues that the State failed to provide sufficient evidence that he had constructive possession over the methamphetamine and heroin found underneath the rock outside Brewer's home and garage. Possession can be either actual or constructive. Actual possession occurs when a person has direct physical control over the contraband in question. *Gray v. State*, 957 N.E.2d 171, 174 (Ind. 2011). When actual possession cannot be shown, such as in Shorter's case, then the conviction may instead rest on proof of constructive possession. *Id.* "A person constructively possesses contraband when the person has (1) the capability to maintain dominion and control over the item; and (2) the intent to maintain dominion and control over it." *Id.*

With regards to the "capability" element of constructive possession, the State must show "that the defendant is able to reduce the controlled substance to the defendant's personal possession." *Goliday v. State*, 708 N.E.2d 4, 6 (Ind. 1999). For the intent element, the State must demonstrate that the defendant had knowledge of the presence of the substance, and such knowledge "'may be

inferred from either the exclusive dominion and control over the premise containing the contraband or, if the control is non-exclusive, evidence of additional circumstances pointing to the defendant's knowledge of the presence of the contraband.'" *Id.* (quoting *Taylor v. State*, 482 N.E.2d 259, 261 (Ind. 1985)). A non-exhaustive list of examples of possible "additional circumstances" showing knowledge may include:

> (1) a defendant's incriminating statements; (2) a defendant's attempting to leave or making furtive gestures; (3) the location of contraband like drugs in settings suggesting manufacturing; (4) the item's proximity to the defendant; (5) the location of contraband within the defendant's plain view; and (6) the mingling of contraband with other items the defendant owns.

*Gray*, 957 N.E.2d at 175; *see also Gee v. State*, 810 N.E.2d 338, 344 (Ind. 2004) ("[T]he State is required to show that whatever factor or set of factors it relies upon in support of the intent prong of constructive possession . . . demonstrate the probability that the defendant was aware of the presence of the contraband and its illegal character.").

[27] Here, evidence shows that on July 23, 2018, Shorter was observed exiting Brewer's home, walking over to the spot where the methamphetamine and heroin were later found, standing bent over with his hands reaching near the ground and "looking very intently at the ground," tr. vol. III p. 115, and walking back inside the home. During the period officers were surveilling the home that day, no other person was observed near the spot where the drugs were discovered. Additionally, the heroin that was found was cut with the same

cutting agent as the heroin the confidential informant purchased from Shorter a few days prior. This evidence sufficiently shows that Shorter had the capability of maintaining dominion and control over the drugs and that he was able to reduce them to his own personal possession.

[28] Sufficient evidence also demonstrated Shorter's intent to maintain dominion and control over the drugs. After officers received an anonymous tip that Shorter was in town to sell drugs, recordings were obtained via the confidential informant of Shorter arranging a methamphetamine purchase and personally selling heroin. Shorter had expressed a desire to "get . . . out of town" and stated it was "because . . . all [his] locations had . . . been hit." *Id.* at 45; *see also Lampkins v. State*, 682 N.E.2d 698, 700 (Ind. 1997) (stating that flight is an additional circumstance that may support an inference of intent to maintain dominion and control over a controlled substance). During the search of Brewer's home, officers also discovered a digital scale with white residue and several baggies sitting on the table where Shorter had been sitting when he was arrested. Once arrested, Shorter also made incriminating statements, telling officers, "you don't look like nobody I sellin' that to." *Id.* at 228.

[29] We also agree with the State that the facts of this case are comparable to those in *Canfield v. State*, 128 N.E.3d 563 (Ind. Ct. App. 2019). In *Canfield*, officers were dispatched to a Taco Bell after an anonymous caller reported a man, Canfield, in a Taco Bell uniform standing by a dumpster outside the restaurant who appeared to pull something from his waistband and that the item may have been an illegal substance. Once at the restaurant, officers observed Canfield

stand to the side of the food preparation area and "dig[] around his waistband area," and then squat down and stand back up "like he picked up something or had moved something." *Id.* at 573. An officer then went to the spot where Canfield had just been observed and discovered a bag containing multiple smaller bags with a white crystal powdery substance, which later tested positive for methamphetamine. We ultimately found this evidence sufficient to demonstrate constructive possession over the methamphetamine. And given the similarity to the evidence in Shorter's case—an anonymous tip about Shorter's drug dealing, the officers' observations of Shorter bending over the spot where the drugs were found and moving his hands around, plus evidence from the controlled buys and of Shorter's intent to flee—we find no reason to conclude differently here.

### *Conspiracy and Aiding, Inducing, or Causing Convictions*

[30]     Shorter also argues that his other two convictions centering on the controlled buys that took place on July 18, 2018—conspiracy to commit dealing in a narcotic drug and aiding, inducing, or causing dealing in methamphetamine— are supported by insufficient evidence.

[31]     To convict Shorter of conspiracy to commit dealing in a narcotic drug, the State was required to show that Shorter, with the intent to commit dealing in a narcotic drug, agreed with Martin to commit that felony. I.C. § 35-41-5-2(a). For aiding, inducing, or causing dealing in methamphetamine, the State was required to show that Shorter "knowingly or intentionally" aided, induced, or caused Martin to commit dealing in methamphetamine, even if Martin himself

was never prosecuted for or convicted of dealing in methamphetamine. I.C. § 35-41-2-4.

[32] Shorter claims that the State failed to present any evidence that Shorter had any possession of methamphetamines on July 18. Shorter also argues that the video and audio evidence shows the confidential informant buying the methamphetamine from another individual, but that "[t]here was no evidence that [Shorter] was present during the drug buy." Appellant's Br. p. 17.

[33] But neither of these arguments are relevant to determining whether the evidence supports the convictions for conspiracy to commit dealing and aiding, inducing, or causing dealing. The evidence shows that Shorter initially agreed to sell the informant methamphetamine, but then told her he could only sell her heroin and that she should contact Martin if she wished to purchase methamphetamine. Shorter then provided Martin's contact information, which the informant did not previously have, to facilitate the methamphetamine purchase. The informant then arranged and completed a controlled buy from Martin, who sold her seven grams of methamphetamine in exchange for $200. Shorter even made statements to officers that indicated he knew Martin and was working with him to sell the drugs, stating, among other things, that Martin "brought [him] down here" and "made [him] work." Tr. Vol. III p. 217.

[34] Based on this evidence, we find that a factfinder could reasonably infer that Shorter arranged the purchase of methamphetamine from Martin, that Martin and Shorter were working together to try and sell the methamphetamine and

heroin, and that this joint effort let to Martin actually selling the methamphetamine to the informant. As such, we find that the evidence was sufficient to support the convictions for conspiracy to commit dealing in a narcotic drug and aiding, inducing, or causing dealing in methamphetamine. To conclude otherwise would require us to reweigh the evidence, which we may not do.

[35]    The judgment of the trial court is affirmed.


Bradford, C.J., concurs.
Pyle, J., dissents with a separate opinion.

Robert Shorter,

*Appellant-Respondent,*

v.

State of Indiana,

*Appellee-Petitioner.*

Court of Appeals Case No.
19A-CR-2904

**Pyle, Judge dissenting with opinion.**

[36]    I respectfully disagree with my colleague's conclusion that law enforcement could not have obtained an arrest warrant and that there were exigent circumstances justifying the warrantless entry into the residence.[12]  Implied in their conclusion is the belief that law enforcement could not have obtained an arrest warrant because they did not know Shorter's name.  In addition, my colleagues conclude that Shorter's desire to leave town was an *emergency*

---

[12] Because I would find a violation of the Fourth Amendment of our Federal Constitution, I do not address Shorter's argument concerning Article 1, sec. 11 of the Indiana Constitution.

permitting law enforcement officers to dispense with obtaining an arrest or search warrant to prevent the *imminent* destruction or removal of evidence. My colleagues seem to argue that the exigency was Shorter's desire to leave the State of Indiana. To fit into a recognized exigent circumstance exception, I assume that law enforcement was concerned that Shorter would leave, taking with him evidence of his drug dealing, thereby destroying or removing it from Indiana. However, I disagree. Because an arrest warrant could have been obtained and the facts do not demonstrate the existence of an emergency or the imminent destruction or removal of evidence, I believe the evidence obtained on the date of Shorter's arrest should not have been admitted at trial.

[37] When law enforcement officers want to enter a structure to arrest an individual or conduct a search, they must obtain a warrant from a neutral and detached judicial authority. U.S. CONST. amend IV. "The purpose of this provision is to protect citizens from State intrusions into their homes." *Ware v. State*, 782 N.E.2d 478, 481 (Ind. Ct. App. 2003), *reh'g denied*. However, as my colleagues ably state, this well-established rule has exceptions. For example, a warrant is unnecessary if the "exigencies of the situation make the needs of law enforcement so compelling that a warrantless [entry] is objectively reasonable under the Fourth Amendment." *Missouri v. McNeely*, 569 U.S. 141, 148-49 (2013); *See also Kentucky v. King*, 563 U.S. 452 (2011). Such exigencies include when law enforcement officers: (1) need to provide emergency assistance to an occupant of a home, *Michigan v. Fisher*, 558 U.S. 45, 47-48 (2009); (2) are pursuing a fleeing suspect, *U.S. v. Santana*, 427 U.S. 38, 42-43 (1976); (3) need

to enter a burning building to extinguish or investigate a fire, *Michigan v. Tyler*, 436 U.S. 499, 509-10 (1978); or, as here, (4) to prevent the *imminent* destruction or removal of evidence, *Id.* at 509; *Ware*, 782 N.E.2d at 481. Whether police faced an *emergency* that justifies acting without a warrant requires us to look at the totality of the circumstances and assess "each case of alleged exigency based on its own facts and circumstances." *McNeely*, 569 U.S. at 150 (internal quotation marks and citation omitted). The fact that drugs are involved does not alone amount to the existence of exigent circumstances justifying a warrantless entry to search or arrest. *Ware*, 782 N.E.2d at 481.

[38]    In this case, law enforcement officers were required to obtain an arrest warrant if they wanted to enter the residence to affect Shorter's arrest; they claimed they could not because they did not know Shorter's name. While it is true that a person's name usually appears on an arrest warrant, it is *not* required. If a person's name is unknown, Indiana law provides that an arrest warrant can designate a suspect by any "name or description by which he can be identified with reasonable certainty[.]" INDIANA CODE § 35-33-2-2(a)(2). Here, law enforcement officers observed Shorter over a long enough period that they could have described him with "reasonable certainty." The officers watched Shorter during the July 18, 2018 drug buy. This is evident from Detective Lance Blossom's trial testimony. He stated that while watching Shorter on July 23, 2018, he "positively identified . . . Robert Shorter, sitting in that residence on a couch." (Tr. Vol. III at 58). In addition, they could also have applied for

a search warrant to enter the residence to look for Shorter, but law enforcement officers chose not to.

[39] Turning to whether exigent circumstances existed justifying the warrantless entry into the residence, we recognize the facts in this case are essential because we cannot "ignore the current and future technological developments in warrant procedures, . . . ." *McNeely*, 569 U.S. at 156. While advances in technology do not guarantee instant access to warrants, we must acknowledge that "technological developments that enable police officers to secure warrants more quickly, and do so without undermining the neutral magistrate judge's essential role as a check on police discretion, are relevant to an assessment of exigency." *Id*. at 155. The advent of the internet, improvements in telephonic and wireless communications, and broadband technology have transformed not only how Indiana courts resolve cases but have given law enforcement the ability to apply for search and arrest warrants with unprecedented speed. *See* F.R. Crim. P. 41(d)(3); IND. CODE § 35-33-5-8(a)(2).

[40] When we consider the advent of technology over the last several decades, it becomes clear that the facts in this case do *not* establish the existence of an emergency demonstrating the imminent destruction or removal of evidence. There is no evidence that Shorter was taking any action demonstrating the imminent destruction or removal of evidence. It is true that Shorter wanted to leave town, but that was not going to be possible; Shorter was contained. He was under active surveillance, and, if he had attempted to leave, the officers had the entire law enforcement apparatus of the State to make a felony stop and

warrantless arrest of him once he left the property based upon the probable cause gained from the controlled buy on July 18, 2018. *See* IND. CODE § 35-33-7-1. In addition, the law enforcement officers of the Madison County Drug Task Force, a group skilled in the application for search warrants, watched Shorter for approximately thirty minutes while he was inside the residence (more than enough time to seek a telephonic search warrant); the date was July 23, 2018, a Monday, at approximately 6:24 p.m. (a date and time when judicial officers are likely available). (App. Vol. II at 19). In addition, officers watched Shorter for an additional fifteen minutes as he walked outside the house, went to the garage area, and returned to the house (even more time). In addition, they waited even longer for additional officers to arrive before making a warrantless entry onto the curtilage and into the residence.

[41] When additional officers arrived, they formed a "stack to go up to the front door." (Tr. Vol. III at 60).[13] When the officers approached the entrance to the residence, Shorter was so startled that he "threw U.S. currency everywhere." (Tr. Vol. III at 60).[14] At some point, officers entered the residence and Shorter was subsequently placed under arrest. (Tr. Vol. III at 67). The officers also took the owner of the residence, Holly Brewer ("Brewer"), into custody. (Tr.

---

[13] A tactical stack is a single file formation used to enter a room or structure; officers entering the room alternate their direction of travel to cover all potential threats in the room. J. Pete Blair and M. Hunter Martaindale, *Evaluating Police Tactics: An Empirical Assessment of Room Entry Techniques* (2014).

[14] I respectfully disagree with my colleagues suggestion that the open door and/or Shorter's proximity to it decreases his expectation of privacy.

Vol. III at 122-23). While in police custody, the officers sought and received Brewer's consent to search the residence.[15]

[42] The officers undoubtedly sensed the need to act quickly, but this was not an emergency because there was adequate time for the officers to seek a telephonic search warrant. While my colleagues correctly concede that the best practice for these officers was to obtain a warrant, I submit that it was *the constitutionally required practice*. In 1990, our General Assembly enacted INDIANA CODE § 35-33-5-8(a)(2). This law allows police to avoid the lengthy process of submitting a written affidavit by calling a judicial officer, providing the required information under oath, and recording the conversation for entry into the record. This process should and could have been followed here. Again, at no time does the record establish that Shorter was doing anything related to the imminent destruction or removal of evidence. Police were also watching him for a lengthy period. If Shorter had attempted to leave, officers had the ability to stop him and make a warrantless felony arrest based upon the probable cause that existed as a result of the controlled buy. Again, the exigent circumstances exception requires an *emergency* showing that the destruction or removal of evidence is *imminent*. *McNeely*, 569 U.S. at 150; *Tyler*, 436 U.S. at

---

[15] I do not believe Brewer's consent was voluntary because it was not independent of the illegal entry. *Galvin v. State*, 582 N.E.2d 421 (Ind. Ct. App. 1991), *trans. denied*. The evidence shows that Officers had just made a warrantless entry into the residence, arrested Shorter, and then asked Brewer for consent to search. I do not see how there was sufficient time or other factors that could separate the consent from the illegal entry. To allow law enforcement to cure an unconstitutional entry by obtaining consent after the illegal entry would turn the protections afforded by the Fourth Amendment on its head.

509. Here, my able colleagues are equating Shorter's desire to leave town with the *imminent* destruction or removal of evidence.[16] The evidence does not support this conclusion. As a result, I respectfully dissent and believe the admitted evidence from the residence should have been excluded.[17] The convictions entered for counts III and V should be affirmed, but the convictions for counts I and II should be reversed and the matter remanded for resentencing.

[16] My colleagues cite to *Myers v. State*, 454 N.E.2d 861 (Ind. 1983) and *Banks v. State*, 265 Ind. 71, 351 N.E.2d 4 (1976) as supporting their finding of exigent circumstances. However, I believe these cases are inapplicable. Both were handed down before the enactment of I.C. § 35-33-5-8(a)(2) (allowing for the use of telephonic warrants) and before the Internet was developed (allowing for the use of electronic warrants). As I noted above, the technological advancements in procuring warrants must be considered when assessing exigent circumstances. *See McNeely*, 569 U.S. at 155.

[17] I believe that the drugs found by the K-9 in an area fifteen to twenty-five feet from the residence should also have been suppressed. *See Florida v. Jardines*, 569 U.S. 1, 6 (2013) (holding that the curtilage—that "area 'immediately surrounding and associated with the home'"—to be "'part of the home itself for Fourth Amendment purposes'") (quoting *Oliver v. United States,* 466 U.S. 170, 180 (1984)). A person's home "'protects and privileges all its branches and appurtenants.'" *Id.* at 6-7 (quoting *California v. Ciraolo*, 476 U.S. 207, 213 (1986)). Examples of appurtenances would include, but are not limited to, the property upon which a detached garage is fixed, like the one in this case. *New Orleans Pac. Ry. Co. v. Parker*, 143 U.S. 42, 55 (1892) ("The word 'appurtenant,' as ordinarily defined, is that which belongs to or is connected with something else, to which it is subordinate or less worthy, and with which it passes as an incident,–such as an easement or servitude to land; the tackle, apparel, rigging, and furniture of a ship; a right of common to a pasture; or a barn, garden or orchard to a house or messuage."). As a result, because the drugs found outside were discovered in connection with the warrantless entry, they should be considered "'fruit of the poisonous tree.'" *Segura v. United States*, 468 U.S. 796, 804 (1984) (the exclusionary rule extends to indirect as well as direct products of an unconstitutional search) (quoting *Nardone v. United States*, 308 U.S. 338, 341 (1939)).